UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JUANITA M. SCOTT,  )<br>)<br>Plaintiff,  )<br>)<br>vs.  )<br>)<br>CAROLYN W. COLVIN, Acting  )<br>Commissioner of Social Security,  )<br>)<br>Defendant.  ) | No. 1:15-cv-1463-DKL-TWP |

*Entry on Judicial Review*

Plaintiff appeals the decision of the Commissioner of Social Security denying her application for disability insurance benefits and supplemental security income under the Social Security Act. The parties consented to the Magistrate Judge's exercise of jurisdiction, and the District Judge referred the case to the undersigned to conduct all proceedings and enter judgment in this matter pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. For the following reasons, the Court finds that the decision should be upheld.

**I.  Background**

In May 2012, Juanita M. Scott applied for disability insurance benefits and supplemental security income, alleging disability beginning April 1, 2009. She was 30 years old at the time of the Administrative Law Judge's ("ALJ") decision. She has one year of college education.

Scott testified at the hearing before the ALJ that she was prevented from working mostly because of psychological problems and some physical problems. [R. 42.] She suffers from depression, anxiety, and endometriosis for which she has had repeated surgeries. She said that at the time of the hearing, four or five days each week her depression was so bad that she wants to crawl back into bed and she does not get dressed. [R. 43, 61.] She takes medication for depression. She has a temper and loses control of herself. [R. 47.] She said that she is uncomfortable around people she does not know. [R. 51.] She stayed home most of the time; she has fewer panic attacks when she stays at home. [R. 60.] She spends her time cleaning, doing crafts, and being with family. [R. 64.]

Scott had a spinal block when she delivered her daughter five years before and "it went in the wrong spot." [R. 54.] Since then she has not been able to sit or stand for thirty minutes at a time and she can't carrying anything. [R. 55.] She said that her memory "is not very good." [R. 56.] Scott rated her abdominal pain as a seven on a ten-point scale, with medication. [R. 58.] She testified that she is not able to concentrate on a task for two hours. [R. 61.]

From January 1999 to December 2011, Scott held nineteen different jobs. [R. 62.] She said that she kept each job for a short time because of her depression. She would have a hard time dealing with people at the jobs and controlling her anger [R. 62], leading to arguments with her supervisors and arguments and physical fights with her coworkers. [R. 63.] She also said that she was absent from work too much. [R. 63.]

In 2012 Scott completed a function report, indicating that when she felt energetic, she cleaned the house or played with her daughter. [R. 206.] She said she was forgetful

and need to be reminded of appointments and special dates. [R. 208.] She described her hobbies and interests as reading, planting flowers, playing board games, painting and coloring with her kids, and scrapbooking. [R. 210.] She said that she spends time with others watching movies, scrapbooking, chatting on the computer, and coordinating pitch-in cookouts. [R. 210.] On a regular basis she went to church, the grocery store, doctor appointments, and visited with her mother and friends. [*Id.*]

From 2011 to March 2014, Scott received mental health treatment from Meridian Services. She had a traumatic childhood, including abuse. She was diagnosed with Major Depression, Recurrent, Moderate. Her mother, aunt, daughter, and boyfriend provide a good support system for her.

In June 2011 Scott had a psychiatric assessment with Boris Imperial, M.D. He noted that she started attending Meridian Services "one or two months ago" and was in therapy. [R. 710.] (The records reflect that Scott started at Meridian about one month before, on May 17, 2011. [R. 707; *see also id.* at 700-810.]) Dr. Imperial observed that Scott was articulate; her speech tended to be "rather pressured, but [was] generally goal directed, rational and coherent." [R. 711.] She had no psychotic symptoms, hallucinations, or delusions. He estimated Scott's intelligence as "bright average" and found her insight "fairly good" and her judgment "excellent." [*Id.*] He diagnosed her with Major Depression, Recurrent, Moderate and gave her a GAF score of 40 [R. 712], suggesting some impairment in reality testing or communication or major impairment in several areas such as work, family relations, judgment, thinking, or mood. Dr. Imperial

prescribed Cymbalta, Pristiq, and Remeron for depression and Scott was to continue therapy.

The next month Scott told her case manager that she was doing well after surgery and had begun working at a hotel. [R. 722, 725.] She reported that she felt much better with the medications and had not been feeling as angry or anxious; she was feeling "more herself" while on the medications. [R. 725.] In September, Scott reported that she had been promoted at work from the laundry area to the front desk. [R. 744-45.] A month later, Scott said that she had passed her defensive drivers' test and had begun working in her brother's business. [R. 753-54, 756.] She reported improvement and satisfaction with her medication and she felt she was handling her emotions better. [R. 754, 775.] In November 2011, Scott was seen at the mental health clinic and noted to be well-groomed, euthymic in mood, appropriately alert with some apprehension. [R. 775.] She reported that she had not felt depressed since she had been on Cymbalta; however, she still had some anxiety and felt overwhelmed. [R. 775.] When she did not take her medication regularly and did not attend therapy sessions, she reported increased symptoms. [R. 728-29, 802, 805, 929.]

In August 2012, Scott had a consultative mental status examination with Regina K. McKinney, Psy.D. Scott reported that she was depressed on a daily basis and had a history of physical, emotional, and sexual abuse. She was still taking Cymbalta for depression. [R. 352.] Dr. McKinney noted that Scott was clean and neat in appearance. [R. 355.] Scott reported that she lived with her mother and daughter and that she needed assistance in caring for her daughter because of her physical health problems. [*Id.*] She

4

said that on days she experienced less pain, she assisted with household chores, prepared her own meals, and shopped for groceries. [*Id.*] Scott reported that she last worked in March 2010 and was replaced, explaining that she "had too much time off with surgery." [R. 353.] She also said that she had worked at a Dillard's store for two and one-half years but she was unable to maintain employment because she missed excessive days of work with her multiple surgeries. [*Id.*] Scott stated that she had some poor attention and concentration skills and difficulty multi-tasking but that she got along well with coworkers and supervisors. [*Id.*]

On examination, Dr. McKinney noted that Scott "appeared to be depressed," "cried twice," and "appeared to be somewhat anxious." [R. 355.] She was cooperative and rapport "was adequately established." [*Id.*] She interacted appropriately; she "displayed no psychotic symptomatology;" [h]er remote recall and short-term memory skills were adequate, but her attention and concentration skill were limited." [R. 356.] "[S]he appeared to be of average intelligence." [*Id.*] Dr. McKinney gave Scott a GAF score of 60, representing moderate symptomatology. [*Id.*]

Also in August 2012, state agency psychologist B. Randal Horton completed a Psychiatric Review Technique form, finding that Scott did not have a severe mental impairment. [R. 359-72.] He found that she had a depressive disorder and anxiety disorder. [R. 359, 364.] Dr. Horton opined that as a result of her mental disorders, Scott had no restrictions in activities of daily living; no difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and had no episodes of decompensation of extended duration. [R. 369.] He also opined that her

limitations were due to her physical impairments. [R. 371.] Another state agency psychologist reviewed the record in December 2012 and affirmed Dr. Horton's opinions. [R. 613.]

In March 2013, Scott was assessed by a nurse practitioner at Meridian Services. Scott said that she was losing her grip, had been letting stress build up and was not taking care of herself. She reported that she had been unable to work because of her pain and surgeries. [R. 850.] She was diagnosed with Major Depression, Recurrent, Moderate and assigned a GAF score of 45, representing serious symptoms or serious impairment in social, occupational, or school functioning. [R. 851-52.] Scott's Cymbalta was increased to help with her pain and mood. [R. 852.]

Then in January 2014, a few months before the ALJ's hearing, Scott stopped taking all of her medications; she said that she would be managing her symptoms with her own effort and support from others. [R. 944.]

In March 2014, Scott's Meridian Services case manager, David Austin, completed a mental residual functional capacity assessment. [R. 701, 704.] He indicated that Scott's symptoms of Major Depression included low motivation, low energy, problems sleeping, irritability and problems managing anger and frustration. [R. 704.] He said that her symptoms negatively affected her ability to focus and concentrate and her short- and long-term memory. [*Id.*] He also said that her symptoms interfered with her attendance at appointments and her ability to follow routines and work with others. He concluded that Scott was moderately limited in understanding and memory, as well as sustained concentration and persistence. [R. 702-03.] He determined that she was not significantly

limited in four out of five areas of social interaction and in two out of four areas pertaining to adaption, but was moderately limited in the remaining areas. [R. 703.]

Austin also testified at the ALJ's hearing, stating that Scott had a poor memory, felt overwhelmed, and was frustrated by her inability to do things she used to be able to do. He thought she would have difficulty sustaining a full-time job because she would forget her schedule, be reluctant to go to work, feel overwhelmed, be unable to focus and concentrate, and have conflicts with coworkers and supervisors.

The ALJ denied Scott's claims using the five-step sequential evaluation analysis. He first found at step 1 that Scott had not engaged in substantial gainful activity since her alleged onset date. At step 2 he determined that she had severe impairments including endometriosis and migraine headaches. At step 3 the ALJ found that her impairments did not meet or equal a listed impairment. The ALJ assessed Scott's residual functional capacity and concluded that she can perform work at the light exertional level with some limitations, including that she "can have occasional contact with the general public and with coworkers. She can understand, remember, and perform work tasks at GED Reasoning Level 02 (as defined in the Dictionary of Occupational Titles). She can perform productive work tasks for up to an average of 98 to 100% of an 8-hour workday, not including the typical morning, lunch, and afternoon breaks." [R. 24.] The ALJ then found at step 4 that Scott had no past relevant work, and at step 5 he found that given her age, education, work experience, and residual functional capacity, she could work as a laundry worker, housekeeping-cleaner, and mail clerk. As a result, the ALJ concluded

7

that she was not disabled. The Appeals Council denied review, and Scott brought this action, seeking judicial review of the ALJ's decision.

## II.  Discussion

Judicial review of the ALJ's decision is limited to determining whether the findings of fact are supported by substantial evidence and whether the ALJ made any legal error. *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015); *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Court reviews the entire record but does not reweigh the evidence, resolve conflicts in the record, make credibility determinations, or substitute its own judgment for that of the ALJ. *See Stepp*, 795 F.3d at 718; *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). An ALJ "need not mention every snippet of evidence in the record," *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012), but must build a "logical bridge" between the evidence and his conclusions, *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015). And in doing so, "he may not ignore entire lines of contrary evidence." *Arnett*, 676 F.3d at 592.

Scott first argues that the ALJ erred by finding that her mental impairments were not severe. At step 2 of the sequential analysis, the ALJ determines whether the claimant has an impairment or combination of impairments that is severe. *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010); 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment is severe if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). The step 2 determination

"is a threshold issue only." *Arnett*, 676 F.3d at 591. If the ALJ fails to find one impairment severe, but finds that another impairment is severe and continues with the sequential analysis, then any step 2 error is harmless. *See id.* (holding that any error in omitting a severe impairment was harmless where the ALJ found two impairments severe and continued with the remaining steps of the evaluation process); *Castile*, 617 F.3d at 927 (stating that the ALJ's step 2 "determination is of no consequence with respect to the outcome of the case. Because the ALJ recognized numerous other severe impairments, he was obligated to proceed with the evaluation process."). Here, because the ALJ found that Scott had severe impairments of endometriosis and migraine headaches, he proceeded with the remaining steps of the sequential analysis. Therefore, any error in finding Scott's mental impairments non-severe was harmless.

The cases cited by Scott where the courts remanded are inapposite because the ALJs in those cases found that the claimants had no severe impairments and did not proceed with the remaining steps of the sequential analysis. *See, e.g., Lopez-Navarro v. Barnhart*, 207 F. Supp. 2d 870, 879 (E.D. Wis. 2002) ("The ALJ denied plaintiff's claim at step two of the process, finding that plaintiff did not have any impairment or impairments that significantly limited his ability to perform basic work-related activities."); *Dunn v. Sullivan*, No. 90 C 4106, 1993 WL 730745, at *2 (N.D. Ill. Jan. 29, 1993) ("[T]he ALJ stated that plaintiff did not have any impairment or combination of impairments which significantly limited her ability to perform basic work-related activities and, therefore, she did not have a severe impairment[.]"); *Davis v. Heckler*, No.

83 C 1433, 1984 WL 1287, at *1 (N.D. Ill. Oct. 1, 1984) ("[T]he ALJ found that plaintiff's impairment was not severe and thus did not pass the second of the five tests.").

Scott next argues that the ALJ ignored treating psychologist Dr. Imperial's June 2011 assessment, particularly her GAF score of 40, which indicated that she was totally disabled. Generally, a treating psychologist's opinion about a medical condition is given more weight than the opinion of a non-treating psychologist. *See* 20 C.F.R. § 404.1527. Although the ALJ did not explicitly consider Dr. Imperial's assessment, it was a harmless error because the ALJ's decision is supported by substantial evidence in the record, and the Court is confident that on remand the result would be the same. *See, e.g.*, *Schomas v. Colvin*, 732 F.3d 702, 707–08 (7th Cir. 2013) (stating that the court "will not remand a case to the ALJ for further explanation if [it] can predict with great confidence that the result on remand would be the same"). An ALJ "need only minimally articulate his or her justification for rejecting or accepting specific evidence of a disability" and "need not provide a written evaluation of every piece of evidence." *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) (quotation and citation omitted).

The ALJ did minimally articulate his reasons for determining that Scott's mental impairments were not severe. He noted her improvement with psychiatric and counseling services at the mental health clinic and with medication. [R. 14.] (Scott had only begun attending Meridian Services one month before Dr. Imperial's evaluation.) He also observed that clinical observations reflected Scott's improvement with treatment. [*Id.*] This case is unlike *Lopez-Navarro*, where the ALJ erred in rejecting a treating physician's *uncontradicted* opinion. *See* 207 F. Supp. 3d at 886. Here, Dr. Imperial's

10


assessment is contradicted by other medical evidence, including Dr. McKinney's assessment and GAF score of 60.

Furthermore, a GAF score measures "both severity of symptoms *and* functional level." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citing *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* ("*DSM*") 32 (Text Revision, 4th ed. 2000)). "Because the 'final GAF rating always reflects the worse of the two,' the score does not reflect the clinician's opinion of functional capacity." *Id.* (quoting *DSM* at 33). As the ALJ also referenced, there was no medical source statement in the record from any accepted treating healthcare provider. [R. 23.] This means that Dr. Imperial did not offer any opinion as to Scott's functional limitations, which makes his assessment less helpful. *See Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996) (stating that since the physician "failed to venture an opinion as to the extent of [the claimant's] limitations or as to his residual capabilities, the evidentiary usefulness of his findings is slight, at best"). Contrary to Scott's suggestion, Dr. Imperial's assessment did not "prove" that her mental impairments are severe or that she is disabled; those determinations were for the ALJ to make on the basis of all the evidence.

Moreover, in assessing the severity of Scott's mental impairments and resulting functional limitations, the ALJ considered the evidence, including the Meridian Services clinic records from 2011 to 2014, which generally noted improvement with consistent therapy and medications; the August 2012 consultative mental examination with Dr. McKinney; and the state agency psychologists' opinions also from 2012 that Scott did not have severe mental impairments. [R. 13-16.] The agency consultants' opinions were

given "significant weight" because they were supported by the record evidence and the consultants are considered experts in social security disability evaluation. [R. 16, 23.] *See* 20 C.F.R. § 404.1527(e)(2)(i). The ALJ also considered the evidence of Scott's functioning and daily activities; her work activity after the alleged disability onset date, including the fact that she was promoted to the front desk from the laundry area and her involvement in her brother's restaurant; her volunteer work at a local "head start" school several hours four days a week; and Scott's testimony and that of her case manager. [*See id.* (citing R. 744]). (The ALJ gave good reasons for discounting the case manager's opinion about Scott's ability to remember, manage, and complete daily tasks and appointments—among others, his opinion was substantially contradicted by his clinical observations the same month he completed the functional capacity assessment—Scott's mood was calm, her affect was appropriate; her focus and concentration were good; her motivation and initiative were good. [R. 867.])

The ALJ found that Scott had mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in concentration, persistence, or pace, and no episodes of decompensation. [R. 15-16.] These findings were supported by substantial evidence. The ALJ accounted for Scott's functional limitations resulting from her mental impairments by limiting her to "occasional contact with the general public and with coworkers;" "understand[ing], remember[ing], and perform[ing] work tasks at GED Reasoning Level 02;" and perform[ing] productive work tasks for up to an average of 98 to 100% of an 8-hour workday, not including typical … breaks." [R.

24.] The ALJ's decision that Scott is not disabled under the Social Security Act was supported by substantial evidence.

### III. Conclusion

For the foregoing reasons, the decision denying social security benefits will be affirmed.

DATED: 08/12/2016

*Denise K. LaRue*
Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana

Electronic distribution to counsel of record